## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SMILEDIRECTCLUB, LLC, | |
| Plaintiff | |
| v. | Civil Action No. _____ |
| GEORGIA BOARD OF DENTISTRY; TANJA D. BATTLE, in her official capacity as Executive Director of the Georgia Board of Dentistry; and THOMAS P. GODFREY, GREGORY G. GOGGANS, RICHARD BENNETT, REBECCA B. BYNUM, TRACY GAY, STEVE HOLCOMB, LOGAN NALLEY, JR., ANTWAN L. TREADWAY, H. BERT YEARGAN, and WENDY JOHNSON, individually and in their official capacities as Members of the Georgia Board of Dentistry, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF

Plaintiff SmileDirectClub, LLC ("Plaintiff" or "SDC") alleges the following against Defendants the Georgia Board of Dentistry (the "Board"), Thomas P. Godfrey, Gregory G. Goggans, Richard Bennett, Rebecca B. Bynum, Tracy Gay, Steve Holcomb, Logan Nalley, Jr., Antwan L. Treadway, H. Bert Yeargan, and

Wendy Johnson (each of the foregoing individuals is sued in his or her individual capacity and in his or her official capacity as Members of the Board), and Tanja D. Battle in her official capacity as Executive Director of the Board:

## INTRODUCTION

1.     This is an action to enjoin the enforcement of an unauthorized and improper rule adopted by the Georgia Board of Dentistry.  Specifically, the Board recently approved a rule that purportedly "expanded" the list of duties a dental assistant may perform if directly supervised by a licensed dentist under Georgia Rule of Dentistry 150-9-.02(3).  A true and correct copy of Rule 150-9-.02, including the list of ten "expanded" duties, is attached hereto and incorporated herein by reference as Exhibit A.  Subparagraph (aa) of the new Rule provides that a dental assistant may perform "[d]igital scans for fabrication (sic) orthodontic appliances and models" only "under the direct supervision of a licensed dentist." Digital scanning, however, is not the practice of dentistry or dental hygiene and, thus, the Board lacks the authority to regulate this conduct.

2.     By including "digital scans" within the framework of Rule 150-9-.02(3), Subparagraph (aa) bars technicians from performing digital scans of a patient's teeth and gums unless under the direct supervision of a licensed dentist. Notably, the supervision contemplated by the new Rule simply requires that a

2

licensed dentist be in the building while the digital scanning is performed.  It does not require that the licensed dentists perform the digital scan themselves, observe the digital scans, or even be in the same room as the patient when the digital scan is performed.  Thus, effectively, Subparagraph (aa) is aimed uniquely at shops that offer digital scan services apart from dental services.  As a result, Subparagraph (aa) unlawfully restricts Georgia residents' access to affordable aligner treatment, fails to protect the public in any manner, stifles competition, harms consumers, and makes it virtually impossible for Plaintiff to lawfully conduct business in the State of Georgia without making costly and prohibitive changes to its present business model.

## THE PARTIES

3.     Plaintiff SDC is a dental service organization that provides non-clinical administrative support services to contractually affiliated dental practices in Georgia that wish to offer doctor-directed at-home clear aligner treatment for cases of mild to moderate malocclusion (*i.e.* improper positioning of the teeth when the jaws are closed).  SDC is licensed to practice business in the State of Georgia.

4.     The Board consists of eleven members appointed by the Governor to regulate and enforce the standards of the practice of dentistry.  By statute, nine

members of the Board must be dentists, one member of the Board must be a dental hygienist who is not a dentist, and one member of the Board must be an individual who is neither a dentist nor a dental hygienist.  O.C.G.A. § 43-11-2.  Upon information and belief, one of the nine seats allocated to dentists is presently vacant, meaning that the Board presently consists of ten members, eight of whom are dentists.  The Board's authority is limited to regulating the practice of dentistry and dental hygiene and those who practice dentistry or dental hygiene in the State of Georgia.  The Board has no authority over activities that do not constitute dentistry or dental hygiene or individuals and organizations, such as SDC, that provide non-clinical administrative support services to dental providers.

5.      Defendant Tanja D. Battle is the Executive Director of the Georgia Board of Dentistry.

6.      Defendant Thomas P. Godfrey, D.M.D., is the President and one of the eight current dentist members of the Board.  Upon information and belief, Dr. Godfrey is a licensed, practicing dentist with an office in Atlanta, Georgia.

7.      Defendant Gregory G. Goggans, D.M.D., is the Vice President and one of the eight current dentist members of the Board.  Upon information and belief, Dr. Goggans is a licensed, practicing orthodontist with offices in various locations throughout Georgia.  According to the website for his practice, Dr.

4

Goggans offers patients clear aligner treatment products and services that compete with the products and services offered by SDC and its affiliated dental practices.

8.     Defendant Richard Bennett, D.M.D., is one of the eight current dentist members of the Board.  Upon information and belief, Dr. Bennett is a licensed, practicing dentist with an office in Gainesville, Georgia.

9.     Defendant Rebecca B. Bynum, R.D.H., is a current member of the Board.  Upon information and belief, Ms. Bynum is a registered dental hygienist.

10.     Defendant Tracy Gay, D.M.D., is one of the eight current dentist members of the Board.  Upon information and belief, Dr. Gay is a licensed, practicing dentist with an office in Dublin, Georgia.  According to the website for his practice, Dr. Gay offers patients clear aligner treatment products and services that compete with the products and services offered by SDC and its affiliated dental practices.

11.     Defendant Steve Holcomb, D.M.D., is one of the eight current dentist members of the Board.  Upon information and belief, Dr. Holcomb is a licensed, practicing dentist with an office in Byron, Georgia.

12.     Defendant Logan "Buzzy" Nalley, Jr., D.M.D., is one of the eight current dentist members of the Board.  Upon information and belief, Dr. Nalley is a licensed, practicing prosthodontist with an office in Augusta, Georgia.

13.     Defendant Antwan L. Treadway, D.M.D., is one of the eight current dentist members of the Board.  Upon information and belief, Dr. Treadway is a licensed, practicing oral surgeon with an office in Atlanta, Georgia.

14.     Defendant H. Bert Yeargan, D.M.D., is one of the eight current dentist members of the Board.  Upon information and belief, Dr. Yeargan is a licensed, practicing dentist with an office in Brunswick, Georgia.

15.     Defendant Wendy Johnson is a current member of the Board.

### JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over the claims asserted in this Action pursuant to 28 U.S.C. §§ 1331, 1337, 1343, 1367 and 42 U.S.C. § 1983.

17.     The Board was created by the Georgia Legislature to regulate and enforce the standards of the practice of dentistry in the State of Georgia.  *See* O.C.G.A. §§ 43-11-1 *et seq.*  The Board operates in the State of Georgia and the events giving rise to the claims asserted in this Action occurred in the State of Georgia.  Upon information and belief, Defendants Battle, Godfrey, Goggans, Bennett, Bynum, Gay, Holcomb, Nalley, Treadway, and Yeargan are all citizens of the State of Georgia.  *See* O.C.G.A. § 43-11-2 (requiring members of the Georgia Board of Dentistry to be citizens of the State of Georgia).  Accordingly, Defendants are subject to personal jurisdiction in Georgia.

6

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22 because the Board is deemed to reside in any judicial district in which it is subject to personal jurisdiction with respect to this Action, which includes this District.  Venue is also proper in this District because a substantial part of the events or omissions giving rise to the claims asserted in this Action occurred in this District.

19.     The Defendants' actions substantially and adversely affect interstate commerce in the "Relevant Market" as described herein.  Defendants provide services in interstate commerce and certain of the Defendants perform aligner treatment using products that are sold across state lines and from outside the State of Georgia into the State of Georgia.  In addition, by restraining competition for aligner treatment in Georgia, the flow of interstate commerce is interrupted because the purchase of supplies needed for such treatment, and any related services, from outside of Georgia is reduced.  Thus, Defendants' actions have the effect of reducing the amount of interstate commerce to the detriment of consumers.

## FACTUAL BACKGROUND

**A.    SDC Provides Non-Clinical Administrative Support Services to Licensed Dental Providers.**

20.    SDC is a dental service organization that provides non-clinical administrative support services to contractually affiliated dental practices that wish to offer doctor-directed at-home clear aligner treatment for cases of mild to moderate malocclusion using the teledentistry platform and portal provided by SDC.  A clear aligner is a removable appliance made from a strong plastic material that is fabricated to fit an individual's mouth to move the individual's teeth in increments until the desired positioning is achieved.  Teledentistry enables the provision of dental treatment and care via remote technology, rather than on-site personal contact with patients.

21.    Through SDC's teledentistry platform, dentists and orthodontists licensed in the state of Georgia who affiliate with SDC are able to offer at-home aligner treatment at a substantially lower price than traditional aligner treatment offered in an established dental office and are therefore able to treat many patients who otherwise would not have access to an orthodontist.  The SDC platform is built around its proprietary SmileCheck system, a web-based portal that connects patients and doctors, facilitating timely and convenient interaction.

8

22.     SDC's affiliated practices are revolutionizing orthodontic treatment by dramatically lowering the price of aligner treatment for mild to moderate cases of malocclusion and providing greater access to aligner treatment for the residents of the State of Georgia.

23.     SDC's mission of providing affordable aligner treatment to the underserved is important in the State of Georgia, where approximately 63.5% of Georgia counties do not have a licensed orthodontist.

24.     Among the suite of non-clinical administrative support services offered by SDC is the provision of a SmileShop to SDC-affiliated licensed dentists and orthodontists.

25.     SmileShops are locations where customers may receive digital photographs of their teeth and gums through the use of an iTero scanner to determine if they are a candidate for SDC's clear aligner product.  The iTero scanner is cleared as safe and effective by the FDA.  And unlike devices that are used for medical or dental procedures, such as x-ray machines, the iTero scanner does not need to be registered with or inspected by the state prior to use.  The digital photographs created by the iTero scanner are necessary for SDC's licensed dentists and orthodontists to provide aligner treatment and thereby compete in the "Relevant Market" as defined below.

26.    The digital scan at the SDC SmileShops in Georgia is performed by a trained technician or assistant using an iTero scanner, which is essentially a wand with a camera, to take thousands of photographs of a customer's teeth and gums. The photographs are sent to the SDC lab, where trained technicians receive the patient's scans on behalf of the treating dentist or orthodontist, and, if the scans are deemed acceptable, coordinate the creation of a 3D digital model from those scans to create a model treatment plan. This treatment plan, along with the photographs, customer health history, and other required information, is provided to a Georgia licensed dentist or orthodontist for review and evaluation.

27.    The digital scan consists of thousands of photographs, which generate a 3D model of the patient's maxillary and mandibular dentition, along with the attached gingiva and supporting oral mucosa, from different perspectives such as maxillary, open, mandibular open, and in centric occlusion. The iTero scanner takes approximately 6,000 photographs per second.

28.    The technician also takes standard digital photographs of the customer's teeth and gums which are also provided to the Georgia licensed dentist or orthodontist for review and evaluation to identify periodontal disease, cavities, or any other presentation that would require further clearance or prevent the customer from being a candidate for SDC clear aligners.

10

29.     The Georgia licensed dentist or orthodontist evaluates the customer's digital scans, photographs, and medical and dental history questionnaire to determine if aligner therapy is appropriate for the patient.  The Georgia licensed dentist or orthodontist also determines whether any additional information, x-rays, or further photographs are required or appropriate.  If so, the dentist indicates what additional information is required before a treatment decision can be made.

30.     Throughout the process, the licensed dentist or orthodontist maintains sole responsibility for all aspects of patient care and all clinical decisions, including evaluating, diagnosing, and, if appropriate in the licensed dentist's or orthodontist's independent professional judgment, treating the patient's condition with SDC clear aligners.

31.     Each SDC-affiliated dentist or orthodontist who treats a Georgia citizen is licensed and qualified to practice dentistry in the State of Georgia.

32.     SDC's entry into the market and offering of top-notch, low-cost clear aligners has been embraced by many in the public and dental community.  Through the use of SmileShops and its web-based teledentistry platform, SDC has been able to drastically reduce the cost of expensive (and often overpriced) aligner treatment and increase access to aligner treatment for many unreached segments of the

population, all while ensuring that patients receive treatment from and are closely monitored by Georgia licensed dentists and orthodontists.

33.    Since SDC opened its first SmileShop in Georgia in July 2017, SDC has performed thousands of scans for customers in Georgia without a single incident or complaint of physical injury, infection, or other adverse patient outcome associated with the performance of the scan.  In addition, SDC has performed hundreds of thousands of scans on a national basis without a single such incident or complaint.

**B.    The Board Improperly Votes To Regulate Digital Scans.**

34.    Against this backdrop of lower-cost treatments, increased access to patient care, and direct oversight by Georgia licensed dentists and orthodontists, the Board approved amendments to Georgia Board of Dentistry Rule 150-9-.02 on or about January 24, 2018, which are scheduled to become effective on May 22, 2018.

35.    A true and correct copy of the amendments to Georgia Board of Dentistry Rule 150-9-.02 is attached hereto as Exhibit A.

36.    The amendments added ten additional duties to the list of "expanded" duties a dental assistant may perform under Rule 150-9-.02(3).

37.     One of the additional duties added to the list appears as Subparagraph (aa) of Rule 150-9-.02(3) and states as follows: "(aa) Digital scans for fabrication (sic) orthodontic appliances and models" (hereinafter "Subparagraph (aa)").

38.     As written, Subparagraph (aa) will require digital scans in Georgia to be made in a dentist's office under the direct supervision of a licensed dentist, rather than in a SmileShop with a trained technician who provides the same digital scans to a Georgia licensed dentist or orthodontist through SDC's web-based platform.

39.     Moreover, when Subparagraph (aa) becomes effective, SDC will potentially be subject to the threat of: (1) Board action seeking to enjoin SDC from conducting business in Georgia, *see* O.C.G.A. § 43-11-2(e); and (2) enforcement action by the State seeking criminal penalties, *see* O.C.G.A. §§ 43-11-50, 43-11-76.

40.     Prior to the adoption of Subparagraph (aa), SDC customers could, and did, visit a conveniently located SmileShop and request a digital scan from a qualified technician without requiring the presence or direct supervision of a licensed dentist or orthodontist.  At no time prior to the adoption of Subparagraph (aa) did the Georgia Board of Dentistry advise SDC that its SmileShops were in

violation of any law, regulation, or rule regarding the practice of dentistry or dental hygiene.

41.    Indeed, such direct supervision is wholly unnecessary because (1) the process is simple, only involving use of a wand with a disposable sleeve and camera, (2) there is no trauma or health or safety risk to a customer, (3) the scan does not emit radiation, (4) the software in all digital scanners on the market prevents the technician from uploading an incomplete scan that has not captured all necessary intraoral structures, and (5) all photographs are later reviewed by a Georgia licensed dentist or orthodontist to ensure the quality of the photographs, a customer's candidacy for treatment, and a proper treatment plan.

42.    The adoption of Subparagraph (aa) fails to acknowledge such realities. To the contrary, it places patients last by severely impairing SDC's ability to deliver affordable products and services to affiliated licensed dentists and orthodontists, who in turn pass these savings along to their patients.

43.    Indeed, the adoption of Subparagraph (aa) makes it virtually impossible for SDC and its affiliated licensed dentists and orthodontists to lawfully conduct business in Georgia without making costly and prohibitive changes to SDC's current business model.

14

44. Thus, as set forth in greater detail below, Subparagraph (aa) should be removed from the amendments because it (1) reduces Georgia citizens' access to care, (2) increases the cost of digital scans and overall orthodontic care, (3) does not protect the public, (4) disproportionately regulates a safe procedure, (5) creates an unnecessary barrier to employment for Georgia citizens, (6) is beyond the Board's rulemaking authority, (7) distinguishes between technicians employed by SDC and extended duty dental assistants who perform scans "directly supervised" (within the meaning of Rule 150-9-.01(2)) by licensed dentists and orthodontists, without a rational basis for such a distinction, and (8) deprives SDC of its constitutionally protected liberty and property interests.

45. On April 30, 2018, Georgia Governor Nathan Deal signed a "Certification of Active Supervision," pursuant to the Georgia Professional Regulation Reform Act, O.C.G.A. § 43-1C-1 *et seq.* The context and circumstances, however, demonstrate that the State of Georgia did not actively or adequately supervise the Board with regard to its action in passing Subparagraph (aa). Instead, the Board impeded the State of Georgia's ability to actively and adequately supervise the substance of the Board's actions by failing to fully advise the Governor of the reasons for its action and the objections to its actions in passing Subparagraph (aa). For example, the Board's official minutes fail to

provide a full and complete summary of objections to the Board's action expressed during official Board meetings, thereby depriving the State of Georgia of the information needed to actively and adequately supervise the Board's conduct.  The Board also failed to explain to the State of Georgia the impact Subparagraph (aa) will have on consumers in the "Relevant Market" and failed to reveal the conflicts of interest of the Defendants who will benefit monetarily, now or in the future, by restraining trade in the "Relevant Market."

## C.   The Relevant Market.

46.     The "Relevant Market" in which to evaluate the anticompetitive effect of the conduct of Defendants is the market for aligner treatment for mild to moderate malocclusion in Georgia.

47.     The relevant products in this market are aligner treatments for mild and moderate malocclusion.  The relevant products include clear aligners and traditional braces that use brackets and wires, as well as potentially non-fixed dental braces such as retainers, headgear, and palate expanders.  Treatment options, of course, vary based on the particular needs of a patient, but these products are viable substitutes for consumers to consider in the treatment of mild-to-moderate malocclusion.  The relevant market properly excludes aligner treatment of severe malocclusion because clear aligners are generally not an option for such treatment,

and as such, consumers who need treatment for severe malocclusion do not regard clear aligners as a viable substitute.  Treatment of severe malocclusion is substantially more expensive than treatment of mild-to-moderate malocclusion and may involve surgical services as well.

48.    The relevant geographic market is properly limited to Georgia.  The Board purports to exercise authority over the provision of digital scan services for aligner treatment in Georgia.  Furthermore, consumers in Georgia almost always seek aligner treatment from local providers in the State.  Consumers who desire such services in Georgia do not travel out of state in any appreciable numbers to obtain aligner treatment.  If the price of aligner treatment for mild-to-moderate malocclusion in Georgia increases as a result of actions of the Board, consumers in Georgia will not seek aligner treatment from providers in other states.  Rather, such consumers will be forced to pay the higher prices for aligner treatment and travel long distances within Georgia to seek such services only from licensed dentists in Georgia.

### D.    The Board Exceeded Its Rulemaking Authority.

49.    The Board is limited in its rulemaking authority—it may only regulate the practice of dentistry and those professionals who engage in the practice of dentistry.  The Board has no authority to regulate industries or activities that do not

constitute the practice of dentistry or dental hygiene, such as dental support organizations, or those individuals who are not engaged in the practice of dentistry or dental hygiene.  *See* O.C.G.A. § 43-11-9.

50.     "Dentistry" is defined in the Georgia statutes as the "evaluation, diagnosis, prevention, or treatment, or any combination thereof, whether using surgical or nonsurgical procedures, of diseases, disorders, or conditions, or any combination thereof, of the oral cavity, maxillofacial area, or the adjacent and associated structures, or any combination thereof, and their impact on the human body provided by a dentist, within the scope of his or her education, training, and experience, in accordance with the ethics of the profession and applicable law . . . ."  O.C.G.A. § 43-11-1(6).

51.     The taking of a digital scan, in and of itself, does not constitute an "evaluation, diagnosis, prevention, or treatment" and, therefore, falls outside of the practice of dentistry.  Similarly, the taking of a digital scan is not listed as one of the acts that constitute the practice of dental hygiene as that term is used in the Georgia Dental Practice Act.  *See* O.C.G.A. § 43-11-74.  Moreover, trained technicians do not provide diagnosis or dental advice; instead, they are simply taking a digital scan and uploading this information to a state licensed dentist or orthodontist for review, diagnosis, and preparation of a treatment plan.

Accordingly, the Board has no authority to regulate scans or those technicians who would otherwise be permitted to conduct digital scans, such as SDC technicians.

52.     Thus, the Board has impermissibly exceeded the scope of its rulemaking authority in approving Subparagraph (aa) and seeking to regulate activities that do not constitute the practice of dentistry and individuals who are not engaged in providing dental evaluation, diagnosis, prevention, or treatment.  The decision of the Board was made without cause or explanation and is merely designed to protect the business interests of traditional orthodontic practices.

**E.     Subparagraph (aa) Will Reduce Georgia Citizens' Access to Care.**

53.     Subparagraph (aa) will diminish Georgia citizens' access to care by reducing the number of locations where digital scans may be taken for fabrication of orthodontic appliances and models.

54.     At present, only 58 of 159 Georgia counties have a licensed orthodontist.

55.     Despite the massive volume of underserved patients in Georgia, the Board seeks to impose a new rule that would needlessly complicate an otherwise safe procedure that an unlicensed person can perform in a variety of locations.

56.     Under such a scheme, SDC would no longer be able to provide one of the key elements of the services it currently offers to Georgia licensed dentists and

orthodontists, which allows them to provide affordable treatment to potential patients. The dentist members of the Board, however, would be able to use their dental assistants to continue to provide such scans to patients. Moreover, no law or regulation would prohibit the dentist members of the Board who are not currently providing digital scans to potential patients from providing such scans in their offices in the future.

57.     Despite current plans to open additional SmileShops across the State of Georgia, many in areas where people cannot easily access orthodontic care and treatment, SDC would be forced to limit, if not entirely eliminate, its plans for increasing access to affordable orthodontic care across the State of Georgia if Subparagraph (aa) were to take effect.

58.     As a result, rather than protect patients, the Board's decision will unnecessarily drive up costs and decrease access to care in the Relevant Market based on the mistaken belief that a 3D scan must be performed by, or directly supervised by, a dentist. Indeed, the Board's decision does not require that a licensed dentist visually monitor or observe the taking of a digital scan; it requires only that a licensed dentist be in the same building at the time the scan is performed.

59.     Taking a digital scan of a customer's teeth and gums is neither dangerous nor risky.  It is nothing more than the taking of photographs.  Nor does it require the knowledge, training, and education of a licensed dentist or orthodontist or an extended duty dental assistant to properly execute.

60.     Properly trained technicians such as those employed by SDC are capable of safely and accurately taking a digital scan of a customer's teeth and gums without the need for a dentist to be present.  Indeed, the scan is not even a dental procedure, but rather a non-invasive use of digital technology to create an accurate three-dimensional model of a prospective patient's teeth, bite, gums, and palate.

61.     There is no known evidence that digital scans taken under the "direct supervision" of a licensed dentist or orthodontist are somehow safer or more accurate than scans taken without such "supervision."

F.     **Subparagraph (aa) Will Increase The Cost Of Digital Scans And Overall Orthodontic Care.**

62.     The adoption of Subparagraph (aa) will unnecessarily increase the cost of digital scans and overall aligner treatment for Georgia consumers by requiring highly paid personnel to perform an otherwise safe and simple procedure. Many Georgia consumers also will incur increased costs by needing to travel to and pay for an office visit to a dentist or orthodontist, particularly when the office

visit is not covered by insurance.  This increase in cost will be borne by consumers, who will pay more for such services than they otherwise would need to pay.

63.    Plaintiff SDC also will suffer significant economic injury and damage as a result of the implementation of Subparagraph (aa).  SDC will suffer lost business that it would have obtained by offering lower priced and superior services to those offered by dentists and orthodontists.

64.    Indeed, the only parties who benefit from such a rule change are the licensed dentists and orthodontists who offer, or will offer, such services in their offices, because they will be able to demand additional compensation for requiring a photo session to take place in their office.  Such requirements drive up costs and entirely eliminate the ability of some citizens to receive convenient, affordable care; indeed, care that has been proven to positively impact many other aspects of a person's overall health.

### G.    Subparagraph (aa) Does Not Protect The Public.

65.    Even if the Board had the authority to impose regulations on the taking of digital scans, which it does not, Subparagraph (aa) would not provide any additional protection to the public.

66.    The taking of a digital scan is extremely safe, and the process consists of using a wand with a camera at varying angles to approximate the teeth and

tissue so as to get a more accurate and predictable model of the teeth and gums than physical impressions.

67.    The technology of taking digital scans is extremely user-friendly, providing real time feedback to the user regarding the accuracy of the scan and informing the user of where additional scans are needed to complete the full scan.

68.    This advanced process does not use any radiation and allows a technician to photograph a patient's teeth and gums without the patient experiencing any trauma, pain, or morbidity.

69.    The digital scanners are also easy to clean between patients and thus present no meaningful risk of cross-contamination as long as the technicians remove and discard the disposable cover and wipe the wand with a disinfecting wipe after each use.  SDC technicians are carefully trained on these procedures and are required to follow them after each scan.

70.    Given that digital scans present virtually no risk to consumers, Subparagraph (aa) unnecessarily complicates a safe procedure by needlessly imposing regulatory burdens that do not provide any additional protection to the public.

71.    Indeed, as noted above, SDC has performed hundreds of thousands of customer scans in existing SmileShops nationwide—and thousands of customer

scans in Georgia alone—without receiving a single complaint of physical injury, infection, or other adverse patient outcome associated with the performance of the scan.

## H.     Subparagraph (aa) Will Disproportionately Regulate A Safe Procedure.

72.     Subparagraph (aa) disproportionately regulates an extremely safe procedure by requiring education and certification requirements that are more stringent than the Board's requirements for more invasive and dangerous procedures.

73.     The adoption of Subparagraph (aa) results in greater restrictions on digital photographs than the following procedures, all of which are more invasive and dangerous and require more medical/dental training and experience than does a digital scan:

- capturing a radiographic image using ionizing radiation (x-ray);

- removing sutures;

- applying topical anesthetic;

- cementing temporary crowns and bridges with intermediate cement;

- placing intracoronal temporary restorations using intermediate cement;

- polishing the enamel and restorations of the anatomical crown;

- removing dry socket medication;

24

- cutting and tucking ligatures; and

- performing phlebotomy and venipuncture procedures.

74.    Moreover, the current framework and prohibitions within the existing rule evidence a regulatory intent that is at odds with the adoption of Subparagraph (aa).

75.    Specifically, virtually all of the procedures that are required to be directly supervised by a licensed dentist involve (1) invasive procedures or (2) the administration of sedation compounds, such as nitrous oxide.

76.    Digital scans, however, are not threatening to patient safety.

77.    In sum, digital scans do not constitute the practice of dentistry or dental hygiene and are not in need of additional oversight or regulation.  Rules that allow trained technicians to perform such scans on their own are sufficient to protect patients while simultaneously promoting increased access to care and lower cost to consumers in the Relevant Market.

## I.    Subparagraph (aa) Will Create An Unnecessary Barrier To Employment For Georgia Citizens.

78.    Subparagraph (aa) will create an unnecessary barrier to employment for Georgia citizens by adopting strict education and certification requirements before a person can perform a digital scan in Georgia.  Moreover, because of increased regulatory barriers, SDC, and others like it, would no longer be able to

open shops at which digital scans are conducted throughout the State of Georgia, reducing the number of opportunities for qualified technicians and harming competition in the Relevant Market.

**J.    Subparagraph (aa) Is Fatally Ambiguous And Confusing As Written.**

79.    The term "[d]igital scans" in Subparagraph (aa) is not defined, rendering it ambiguous as to what duties, conduct, or procedures are included such that they must be made in a dentist's office under the "direct supervision" of a licensed dentist.  The lack of any definition of the term "digital scans" renders Subparagraph (aa) vague, ambiguous, and confusing.

80.    Because Subparagraph (aa) is unenforceable in its current form, it should be deleted from the amendments and the Board enjoined from its implementation.

## CAUSES OF ACTION

## COUNT ONE: DECLARATORY JUDGMENT

### (Brought Against The Board Only)

81.    SDC re-alleges and incorporates paragraphs 1 through 80 as if fully set forth herein.

82.    This Count is brought pursuant to 28 U.S.C. § 2201.

83.     Under the Georgia Administrative Procedure Act, "[t]he validity of any rule . . . may be determined in an action for declaratory judgment when it is alleged that the rule . . . or its threatened application interferes with or impairs the legal rights of the petitioner." O.C.G.A. § 50-13-10(a). "A declaratory judgment may be rendered whether or not the petitioner has first requested the agency to pass upon the validity of the rule . . . in question." *Id.*

84.     O.C.G.A. § 50-13-10 applies to Subparagraph (aa) of the amendments adopted by the Board. *See* O.C.G.A. § 50-13-1 *et seq.*

85.     28 U.S.C. § 2201 authorizes this Court, "[i]n a case of actual controversy within its jurisdiction, . . . [to] declare the rights and other legal relations of any interested party seeking such declaration."

86.     As set forth above, there is an "actual controversy" between SDC and the Board with respect to the enforcement of Subparagraph (aa) against SDC. SDC's rights are in actual jeopardy of being abolished by the enactment of Rule 150-9-.02(3)(aa). Application of Subparagraph (aa) immediately, definitively, and adversely affects SDC's interests because it effectively eliminates SDC's ability to provide low-cost scans at its SmileShops in the State of Georgia. Subparagraph (aa) will reduce Georgia citizens' access to care and increase the cost of digital scans and overall aligner treatment, does not protect the public, would

disproportionately regulate a safe procedure, and will create an unnecessary barrier to employment for Georgia citizens.  Subparagraph (aa) also exceeds the Board's rule-making authority and is fatally ambiguous and confusing as written.  For all of these reasons, detailed above, this Court should declare Subparagraph (aa) invalid.

87.     Accordingly, SDC seeks declarations from this Court pursuant to O.C.G.A. § 50-13-10 and 28 U.S.C. § 2201 that (1) the provision of digital scan services by SDC pursuant to the protocol described above does not constitute the practice of dentistry or dental hygiene within the meaning of O.C.G.A. §§ 43-11-1(6), 43-11-17(a), and 43-11-74 and is therefore outside the regulatory jurisdiction of the Georgia Board of Dentistry; (2) Rule 150-9-.02(3)(aa) is an invalid exercise of the statutory authority granted to the Board; and (3) the Georgia Board of Dentistry may not implement or enforce Rule 150-9-.02(3)(aa).

88.     A copy of this Complaint is being served on the Office of the Attorney General in accordance with O.C.G.A. § 50-13-10.

## COUNT TWO: VIOLATION OF 15 U.S.C. § 1
### (Brought Against All Defendants)

89.     SDC re-alleges and incorporates paragraphs 1 through 88 as if fully set forth herein.

90.     The Defendants, by and through their anticompetitive actions as outlined herein, entered a contract, combination, or conspiracy in restraint of trade and commerce to prevent non-dentists, including, but not limited to Plaintiff, from providing non-clinical administrative support services in the Relevant Market, unless directly supervised by a dentist, and thereby have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

91.     In furtherance of their contract, combination or conspiracy in restraint of trade, the Defendants have agreed and acted upon a policy of excluding non-dentists from providing digital scans without the direct supervision of dentists, thereby harming competition in the Relevant Market.  This agreement among Defendants is expressly stated in Subparagraph (aa) of Rule 150-9-.02(3).

92.     As is evidenced by Defendants' passage of Subparagraph (aa) of Rule 150-9-.02(3), Defendants demonstrated a unity of purpose, as well as common design and understanding, to reduce or eliminate competition in the Relevant Market.

93.     As is demonstrated by Defendants' passage of Subparagraph (aa) of Rule 150-9-.02(3), the Defendants possessed, and still possess, a conscious commitment to a common scheme designed to achieve an unlawful objective.

94.     The Defendants' actions constitute a continuing agreement, understanding, and concert of action among market participants that are practicing dentists in the State of Georgia.

95.     The Defendants' actions have the purpose and effect of unreasonably restraining trade in the Relevant Market, the net effects of which are anticompetitive, and any purported procompetitive justifications are illegitimate and pretextual.  The Defendants' actions have the following anticompetitive effects in the Relevant Market:

a.      preventing and deterring the use of non-dentists for digital scan services needed to provide clear aligner treatment in Georgia;

b.      depriving consumers of the benefits of competition on price and quality for aligner treatment in Georgia by causing new, efficient entrants, like SDC, to shut down or incur higher costs;

c.      reducing consumer choice and the availability of aligner treatment to consumers in Georgia;

d.      reducing incentives for innovation in the provision of aligner treatment in Georgia; and

e.      increasing the prices that customers in Georgia pay for aligner treatment.

96.     The Defendants' actions constitute a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

97.     Alternatively, the Defendants' actions constitute a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason.  On their face, the Defendants' actions restrict, and are intended to restrict, the method of competing in the Relevant Market, thereby restricting the number of competitors and causing prices in the Relevant Market to rise, maintain, or stabilize above competitive levels.  Defendants have market power in the Relevant Market and can enforce their output-restricting agreement by using the legal process of the State of Georgia to preclude entrance into the Relevant Market or to restrict the method of competition in the Relevant Market.  Defendants can, and do, use investigators of the State of Georgia to locate persons who offer digital scan services in contravention of their agreement that only licensed dentists (or those they supervise) offer the service and threaten to use the office of the Georgia Attorney General to enforce sanctions against any individual or business that operates in contravention of their agreement, which results in harm to competition in the Relevant Market.  The Individual Dentist Defendants are actual or potential participants in the Relevant Market and have incentives to restrict competition in

the Relevant Market, and no legitimate business justification exists for Defendants' agreement.

98.    The Defendants' actions evidence predatory intent to deprive dentists that utilize a new, more efficient method of competition of a fair opportunity to compete in the Relevant Market.  Through their actions, Defendants intend to reduce the number of providers of aligner treatment in Georgia and the output of such services.  Defendants' actions do not enhance public health and safety in Georgia and do not serve any legitimate public purpose.

99.    As a direct, proximate, and foreseeable result of the Defendants' actions, Plaintiff has or will suffer damages and injury.

## COUNT THREE: VIOLATION OF EQUAL PROTECTION CLAUSE
### (Brought Against All Defendants)

100.   SDC re-alleges and incorporates paragraphs 1 through 99 as if fully set forth herein.

101.   This Count is brought pursuant to the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

102.   Under the status quo, technicians employed by SDC are permitted to perform digital scans for fabrication of orthodontic appliances and models. Subparagraph (aa), which the Defendants enacted under color of State law,

prohibits technicians employed by SDC from performing digital scans by requiring that such scans be performed only by licensed dentists or orthodontists or by expanded duty dental assistants, acting under the direct supervision of a licensed dentist or orthodontist.  Accordingly, Subparagraph (aa) creates a distinction between persons and entities who offer digital scans by technicians (such as SDC), and persons and entities who offer digital scans by licensed dentists or orthodontists or by expanded duty dental assistants, acting under the direct supervision of a licensed dentist or orthodontist.

103.   The Equal Protection Clause of the Fourteenth Amendment does not allow government to treat similarly situated persons differently unless the reason for doing so bears a rational relationship to a legitimate governmental interest.

104.   As detailed above, there is no rational basis for Georgia's distinction between persons and entities who offer digital scans by technicians and persons and entities who offer the identical service by licensed dentists or orthodontists or by expanded duty dental assistants, acting under the direct supervision of a licensed dentist or orthodontist.  Accordingly, SDC has been denied equal protection of the law.

105.   Unless Defendants are enjoined from committing the above-described violations of the Equal Protection Clause of the Fourteenth Amendment, SDC will

suffer great and irreparable harm.  As detailed above, in the absence of an

injunction, SDC will be prohibited from employing technicians to perform digital

scans and will face the possibility of enforcement action and possible criminal

penalties if it continues to do so.

106.   Accordingly, this Court should grant declaratory and injunctive relief

restraining Defendants' denial to SDC of equal protection of the law and award

SDC attorneys' fees and costs.

## COUNT FOUR: VIOLATION OF DUE PROCESS

### (Brought Against All Defendants)

107.   SDC re-alleges and incorporates paragraphs 1 through 106 as if fully

set forth herein.

108.   This Count is brought pursuant to the Due Process Clause of the

Fourteenth Amendment and 42 U.S.C. § 1983.

109.   SDC possesses liberty and property interests in the ability to conduct a

business that provides non-clinical administrative support services to contractually

affiliated dental practices, including the ability to offer digital scans for fabrication

of orthodontic appliances and models, subject only to regulations that are rationally

related to a legitimate government interest.

110.   Subparagraph (aa), as applied to SDC, deprives SDC of its liberty and property interests that are protected by the Due Process Clause by imposing restrictions on its ability to offer digital scans for fabrication of orthodontic appliances and models that are not rationally related to any legitimate governmental interest.  Indeed, as described above, SDC would be forced to limit, if not entirely eliminate, its plans for increasing access to affordable orthodontic care across the State of Georgia if Subparagraph (aa) were to take effect.

111.   As detailed above, Subparagraph (aa), which Defendants enacted under color of State law, is not rationally related to any legitimate government interest.

112.   Unless Defendants are enjoined from committing the above-described violations of the Fourteenth Amendment, SDC will suffer great and irreparable harm.  As detailed above, in the absence of an injunction, SDC will be prohibited from employing technicians to perform digital scans and will face the possibility of enforcement action and possible criminal penalties if it continues to do so.

113.   Accordingly, this Court should grant declaratory and injunctive relief restraining Defendants' denial to SDC of Due Process and award SDC attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SDC respectfully requests relief as follows:

(a)     Declare that: (1) the provision of digital scan services by SDC pursuant to the protocol described above does not constitute the practice of dentistry or dental hygiene within the meaning of O.C.G.A. §§ 43-11-1(6), 43-11-17(a), and 43-11-74 and is therefore outside the regulatory jurisdiction of the Georgia Board of Dentistry; (2) proposed Rule 150-9-.02(3)(aa) is an invalid exercise of the statutory authority granted to the Board; and (3) the Georgia Board of Dentistry may not implement or enforce proposed Rule 150-9-.02(3)(aa);

(b)     Declare that proposed Rule 150-9-.02(3)(aa), as applied to Plaintiff, violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution.

(c)     Preliminarily and permanently enjoin the enforcement of proposed Rule 150-9-.02(3)(aa) against Plaintiff;

(d)     Award monetary damages for all claims as permitted under statute and law;

(e)     Award treble damages, as provided in 15 U.S.C. § 15;

(f)     Award reasonable attorneys' fees, costs, and expenses in this action pursuant to 15 U.S.C. § 15 and 42 U.S.C. § 1988; and

36

(g)     Award such further relief as the Court deems just and proper.

## JURY DEMAND

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a jury trial of any and all issues in this action so triable of right.

Respectfully submitted this 21st day of May, 2018.

> */s/ Jeffrey S. Cashdan*
> Jeffrey S. Cashdan (Ga. Bar No. 115775)
> jcashdan@kslaw.com
> Stephen B. Devereaux (Ga. Bar No. 219791)
> sdevereaux@kslaw.com
> Madison H. Kitchens (Ga. Bar No. 561653)
> mkitchens@kslaw.com
> Adam Reinke (Ga. Bar No. 510426)
> areinke@kslaw.com
>
> KING & SPALDING LLP
> 1180 Peachtree Street, N.E.
> Atlanta, Georgia  30309
> Phone:  (404) 572-4600
> Fax:  (404) 572-5100
>
> *Attorneys for Plaintiff*
> *SmileDirectClub, LLC*