**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| SMILEDIRECTCLUB, LLC, | |
| Plaintiff | |
| v. | Civil Action No. 1:18-cv-02328-SDG |
| ERIC LACEFIELD, in his official capacity as Executive Director of the Georgia Board of Dentistry; and GREGORY G. GOGGANS, MICHAEL A. KNIGHT, SR., GLENN MARON, AMI PATEL, BRENT STIEHL, DEBRA WILSON, MARK A. SCHEINFELD, MISTY A. MATTINGLY, LARRY W. MILES, JR., J. DON SPILLERS, JR., AND DAVID A. REZNIK, in their official capacities as Members of the Georgia Board of Dentistry, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff SmileDirectClub, LLC ("Plaintiff" or "SDC") alleges the following

against Defendants Gregory G. Goggans, Michael A. Knight, Sr., Glenn Maron,

Ami Patel, Brent Stiehl, Debra Wilson, Mark A. Scheinfeld, Misty A. Mattingly,

Larry W. Miles, Jr., J. Don Spillers, Jr., and David A. Reznik (each of the

foregoing individuals is sued in his or her official capacity as Members of the

Georgia Board of Dentistry ("Board")), and Eric Lacefield in his official capacity as Executive Director of the Board:

## INTRODUCTION

1.     This is an action to enjoin the Board's efforts to prohibit or impede SDC from competing in the market for clear aligner treatment for mild to moderate malocclusion in Georgia.

2.     Prior to SDC's entry into the Georgia market, digital dental scans in Georgia were commonly performed by technicians, hygienists, or assistants—not exclusively by licensed dentists and orthodontists themselves. Recognizing the competitive threat that SDC posed to certain Board members' businesses, and spurred by SDC's expansion into Georgia, the Board decided for the first time to attempt to regulate digital scanning with the specific goal of inhibiting SDC's ability to compete effectively. The Board did so by purporting to expand the duties that "expanded duty dental assistants" may perform to include "[d]igital scans for fabrication (sic) orthodontic appliances and models." Ga. Bd. of Dentistry R. 150-9-.02(3)(aa) (hereinafter referred to as "Subparagraph (aa)").[1] But although Subparagraph (aa) purported to expand the duties of "expanded duty dental

---

[1] A true and correct copy of Rule 150-9-.02, including the list of ten "expanded" duties, is attached hereto and incorporated herein by reference as Exhibit A.

assistants," it had the effect (and intent) of restricting the categories of individuals who could perform such scans, in at least two ways. First, Subparagraph (aa) provides that individuals who do not meet the education and training requirements to qualify as "expanded-duty dental assistants" cannot perform digital scans, even though, upon information and belief, such individuals regularly performed digital scans without incident in Georgia prior to the enactment of Subparagraph (aa). Second, Subparagraph (aa) provides that an "expanded-duty dental assistant" cannot perform a digital scan unless he or she does so under the "direct supervision" of a licensed dentist or orthodontist. But despite the use of the term "direct supervision," Subparagraph (aa) does not require that the dentist or orthodontist see the patient, observe the scan, or even be present in the same room as the patient at the time the scan is conducted. To qualify as "direct supervision," the licensed dentist or orthodontist need only be physically present in the same building as the "expanded-duty dental assistant" at the time the "expanded-duty dental assistant" performs the scan.

3.    Restricting the categories of individuals who can perform digital scans to only licensed dentists or orthodontists or expanded-duty dental assistants acting under the "direct supervision" of a licensed dentist or orthodontist—whether through applying Subparagraph (aa) or interpreting the Georgia Dental Practice Act

(the "Dental Practice Act" or the "Act") itself to prohibit SDC technicians from conducting such scans in SmileShops—is not rationally related to any legitimate government purpose. Instead, such prohibitions are aimed uniquely at shops, such as SDC, that offer digital scan services apart from dental services. As a result, such prohibitions unlawfully restrict Georgia residents' access to affordable aligner treatment, fail to protect the public in any manner, stifle competition, harm consumers, and make it virtually impossible for SDC to lawfully conduct business in the State of Georgia without making costly and prohibitive changes to its present business model.

## THE PARTIES

4.     Plaintiff SDC provides dental support organization services and products to contractually affiliated dental practices in Georgia that wish to offer doctor-directed remote clear aligner treatment for cases of mild to moderate malocclusion (*i.e.* improper positioning of the teeth when the jaws are closed). SDC does not provide aligner treatment to its customers. Its role is limited to providing services and products to licensed Georgia dentists and orthodontists. SDC is licensed to practice business in the State of Georgia.

5.     The Board consists of seventeen members appointed by the Governor to regulate and enforce the standards of the practice of dentistry. By statute,

thirteen members of the Board must be dentists, two members of the Board must

be dental hygienists who are not dentists, one member of the Board must be an

individual who is neither a dentist nor a dental hygienist, and one member must be

a Georgia resident with direct knowledge of the education of dental students and

who is appointed by the Board of Regents of the University System of Georgia.

O.C.G.A. § 43-11-2.  Upon information and belief, four of the thirteen seats

allocated to dentists are presently vacant, meaning that the Board presently consists

of eleven members, nine of whom are dentists.  The Board's authority is limited to

regulating the practice of dentistry and dental hygiene and those who practice

dentistry or dental hygiene in the State of Georgia.

6.      Defendant Eric Lacefield is the Executive Director of the Georgia

Board of Dentistry.

7.      Defendant Glenn Maron, D.D.S, is the President and one of the nine

current dentist members of the Board.  Upon information and belief, Dr. Maron is a

licensed, practicing dentist with an office in Atlanta, Georgia.

8.      Defendant Gregory G. Goggans, D.M.D., is one of the nine current

dentist members of the Board.  Upon information and belief, Dr. Goggans is a

licensed, practicing orthodontist with offices in various locations throughout

Georgia.  According to the website for his practice, Dr. Goggans offers patients

clear aligner treatment products and services that compete with the products and services offered by SDC and its affiliated dental practices. Dr. Goggans was a member of the Board when Subparagraph(aa) was enacted.

9.      Defendant Michael A. Knight, Sr., D.D.S., is one of the nine current dentist members of the Board.  Upon information and belief, Dr. Knight is a licensed, practicing dentist with an office in Eastman, Georgia.

10.     Defendant Misty A. Mattingly, R.D.H., is a current member of the Board.  Upon information and belief, Ms. Mattingly is a registered dental hygienist.

11.     Defendant Larry W. Miles, Jr., D.M.D., is one of the nine current dentist members of the Board.  Upon information and belief, Dr. Miles is a licensed, practicing dentist with an office in Albany, Georgia.

12.     Defendant Ami Patel, D.D.S., is one of the nine current dentist members of the Board.  Upon information and belief, Dr. Patel is a licensed, practicing dentist with an office in Ellenwood, Georgia.

13.     Defendant David A. Reznik, D.D.S., is one of the nine current dentist members of the Board.  Upon information and belief, Dr. Reznik is a licensed dentist who serves as Director of the Oral Health Center of Grady Hospital's

Infectious Disease Program and as Chief of the Dental Medicine Service for the Grady Health System in Atlanta, Georgia.

14.    Defendant J. Don Spillers, Jr., D.M.D., is one of the nine current dentist members of the Board.  Upon information and belief, Dr. Spillers is a licensed, practicing orthodontist with offices in Warner Robins and Macon, Georgia.

15.    Defendant Brent Stiehl, D.M.D., is one of the nine current dentist members of the Board.  Upon information and belief, Dr. Stiehl is a licensed, practicing dentist with an office in Newnan, Georgia.

16.    Defendant Debra Wilson, D.D.S., is one of nine current dentist members of the Board.  Upon information and belief, Dr. Johnson is a licensed, practicing dentist for Grady Health System.

17.    Defendant Mark A. Scheinfeld is a current member of the Board. According to the Board's website, Mr. Scheinfeld is designated as the Board's "consumer member."

### JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over the claims asserted in this Action pursuant to 28 U.S.C. §§ 1331, 1337, 1343, 1367 and 42 U.S.C. § 1983.

19.     The Board was created by the Georgia Legislature to regulate and enforce the standards of the practice of dentistry in the State of Georgia.  *See* O.C.G.A. §§ 43-11-1 *et seq.*  The Board operates in the State of Georgia and the events giving rise to the claims asserted in this Action occurred in the State of Georgia.  Upon information and belief, Defendants Lacefield, Maron, Mattingly, Goggans, Knight, Miles, Patel, Reznik, Spillers, Stiehl, Wilson, and Scheinfeld are all citizens of the State of Georgia.  *See* O.C.G.A. § 43-11-2 (requiring members of the Georgia Board of Dentistry to be citizens of the State of Georgia).  Accordingly, Defendants are subject to personal jurisdiction in Georgia.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22 because a substantial part of the events or omissions giving rise to the claims asserted in this Action occurred in this District.

21.     The Defendants' actions substantially and adversely affect interstate commerce in the "Relevant Market" as described herein.  Defendants provide services in interstate commerce and certain of the Defendants perform aligner treatment using products that are sold across state lines and from outside the State of Georgia into the State of Georgia.  In addition, by restraining competition for aligner treatment in Georgia, the flow of interstate commerce is interrupted because the purchase of supplies needed for such treatment, and any related

services, from outside of Georgia is reduced.  Thus, Defendants' actions have the effect of reducing the amount of interstate commerce to the detriment of consumers.

## FACTUAL BACKGROUND

A.    **SDC Provides Non-Clinical Administrative Support Services to Licensed Dental Providers.**

22.    SDC provides dental support organization services to contractually affiliated dental practices that wish to offer doctor-directed remote clear aligner treatment for cases of mild to moderate malocclusion using the teledentistry platform and portal provided by SDC.  SDC itself does not engage in the practice of dentistry; rather, SDC provides support for licensed dentists and orthodontists who themselves practice dentistry.

23.    A clear aligner is a removable appliance made from a strong plastic material that is fabricated to fit an individual's mouth to move the individual's teeth in increments until the desired positioning is achieved.  SDC's proprietary teledentistry platform enables the provision of dental treatment and care via remote technology, rather than on-site personal contact.

24.    SDC does not itself provide aligner treatment, and instead provides only dental support organization services and products to licensed dentists and orthodontists.  SDC also does not examine, diagnose, treat, or otherwise evaluate

any of its customers.  Only licensed dentists or orthodontists, who are not directly employed by SDC, perform such actions.

25.    Through SDC's teledentistry platform, dentists and orthodontists licensed in the state of Georgia who affiliate with SDC are able to offer remote aligner treatment at a substantially lower price than traditional aligner treatment offered in an established dental office and are therefore able to treat many patients who otherwise would not have access to an orthodontist.  The SDC platform is built around its proprietary SmileCheck system, a web-based portal that connects patients and doctors, facilitating timely and convenient interaction.

26.    SDC's affiliated dental practices have revolutionized orthodontic treatment by dramatically lowering the price of aligner treatment for mild to moderate cases of malocclusion and providing greater access to aligner treatment for the residents of the State of Georgia.

27.    SDC's mission of assisting its affiliated dental practices in providing affordable aligner treatment to the underserved is important in the State of Georgia, where approximately 63.5% of Georgia counties do not have a licensed orthodontist.

28.    Among the suite of dental support organization services offered by SDC is the operation of SmileShops for the benefit of SDC-affiliated licensed dentists and orthodontists.

29.    SmileShops are locations where customers may receive digital photographs of their teeth and gums through the use of an iTero scanner to determine if they are a candidate for SDC's clear aligner product.  The iTero scanner is cleared as safe and effective by the FDA.  And unlike devices that are used for medical or dental procedures, such as x-ray machines, the iTero scanner does not need to be registered with or inspected by the state prior to use.  The digital photographs created by the iTero scanner are necessary for SDC's licensed dentists and orthodontists to provide aligner treatment and thereby compete in the "Relevant Market" as defined below.

30.    The digital scan at the SDC SmileShops in Georgia is performed by a trained technician or assistant using an iTero scanner, which is essentially a wand with a camera, to take thousands of photographs of a customer's teeth and gums. The iTero scanner takes approximately 6,000 photographs per second.

31.    The digital scan consists of thousands of photographs, which generate a 3D model of the customer's maxillary and mandibular dentition, along with the

attached gingiva and supporting oral mucosa, from different perspectives such as maxillary, open, mandibular open, and in centric occlusion.

32.    The scanning protocol remains the same across all customers, which means that SDC's technicians do not make any diagnostic evaluations or exercise any clinical judgment.

33.    The technician also takes standard digital photographs of the customer's teeth and gums that are also provided to the Georgia licensed dentist or orthodontist for review and evaluation to identify periodontal disease, cavities, or any other presentation that would require further clearance or prevent the customer from being a candidate for SDC clear aligners.

34.    Because SDC's technicians do not make clinical judgments and conduct the same scanning protocol across all customers, their role is confined to capturing visual data.  They serve the same function as a photographer.

35.    SDC's technicians are at least as well-equipped—if not more so—to operate the digital scanners than dental assistants, expanded duty dental assistants, dental hygienists, or even dentists or orthodontists because SDC's technicians possess narrow and specialized training on the use of the digital scanning equipment.

36.    SDC's technicians do not treat, diagnose, evaluate, or examine customers at the SmileShops.  SDC's technicians merely collect information from the customer and then provide that information to a Georgia licensed dentist or orthodontist.

37.    The Georgia licensed dentist or orthodontist—who again, is not employed by SDC—evaluates the customer's digital scans, photographs, and medical and dental history questionnaire to determine if the customer is an appropriate candidate for clear aligner therapy.  The Georgia licensed dentist or orthodontist also determines whether any additional information, x-rays, or further photographs are required or appropriate.  If so, the dentist indicates what additional information is required before a treatment decision can be made.

38.    Throughout the process, the licensed dentist or orthodontist maintains sole responsibility for all aspects of patient care and all clinical decisions, including evaluating, diagnosing, and, if appropriate in the licensed dentist's or orthodontist's independent professional judgment, treating the patient's condition with clear aligners.

39.    Each SDC-affiliated dentist or orthodontist who treats a Georgia citizen is licensed and qualified to practice dentistry in the State of Georgia.

40.    SDC's entry into the market and offering of dental support organization services and products to support dentists and orthodontists in providing top-notch, low-cost clear aligners has been embraced by many in the public and dental community.  Through the use of SmileShops and its web-based teledentistry platform, SDC has been able to drastically reduce the cost of expensive (and often overpriced) aligner treatment and increase access to aligner treatment for many unreached segments of the population, all while ensuring that customers receive treatment from and are closely monitored by Georgia licensed dentists and orthodontists.

41.    Since SDC opened its first SmileShop in Georgia in July 2017, SDC has performed thousands of scans for customers in Georgia without a single incident or complaint of physical injury, infection, or other adverse outcome associated with the performance of the scan.  In addition, SDC has performed hundreds of thousands of scans on a national basis without a single such incident or complaint.

**B.    Before SDC Expanded in Georgia, Digital Scans Were Commonly Performed by Individuals Other Than Licensed Dentists or Orthodontists.**

42.    The Dental Practice Act empowers the Board to regulate the practice of dentistry in Georgia and to "bring an action to enjoin any person, firm,

partnership, corporation, or other entity who without being licensed or registered to do so by the board engages in or practices the profession of dentistry." *See* O.C.G.A. § 43-11-2.

43.   The Act defines the "practice of dentistry" by reference to a number of procedures listed in O.C.G.A. § 43-11-17, which was first enacted in 1920 and last updated by the General Assembly in 2004. That list of procedures does not include digital scanning.

44.   Digital scanning is not a new technology. The first digital dental scanning system was developed in the mid-1980s, and the iTero digital scanning system was developed in 2006. By 2011, digital scanning technology had advanced to the point that dentists and orthodontists often used digital scans in their offices for the fabrication of clear aligners.

45.   Consistent with the fact that the Act does not expressly define digital scanning as the practice of dentistry, upon information and belief, at the time SDC opened its first SmileShop in Georgia, digital scanning was often performed in Georgia by assistants, hygienists, or technicians—not exclusively by licensed dentists or orthodontists themselves.

46.   Upon information and belief, the Board took no action to regulate digital scanning or to prohibit non-dentists and non-orthodontists from taking

digital scans before SDC opened its first SmileShop in Georgia, even though digital scanning had become commonplace in many dental offices years before SDC entered the Relevant Market. Indeed, in many dental offices across the State, non-dentists performed digital scans prior to the enactment of any rule purporting to allow them to do so.

47.    When SDC opened its first SmileShop in Georgia, however, the Board members viewed SDC's entry into the Georgia market with alarm.  On August 30, 2017, for example, then-Board Member Dr. Steve Holcomb sent an email to several Board Members asking if the Board had "dropped the ball" on companies that provide direct-to-consumer orthodontic products.  He noted that SDC "is pushing the Georgia market very strongly," observed that SDC had a location in Atlanta, and asked if someone could investigate.

48.    Similarly, on November 9, 2017, then-Board Member Richard Bennett responded to an email forwarded to him containing a social media post about SDC from the American Association of Orthodontists ("AAO")—a trade organization that includes orthodontists who directly compete against SDC in the Relevant Market.  In that post, the AAO noted that it sent complaints to 36 state dental boards about SDC and raised the prospect of whether SDC's "business model violates certain states' unauthorized practice of dentistry laws."  When

asked where the Board stood on these issues, Dr. Bennett responded: "Totally against the model and the delivery. We are working toward having an action item soon."

49. That "action item" was Subparagraph (aa)—a rule that, on its face, purports to expand the duties of an "expanded duty dental assistant" but, in actuality, severely restricts the categories of individuals who can perform digital scans in Georgia by excluding anyone other than a licensed dentist or orthodontist or an expanded-duty dental assistant acting under the "direct supervision" of a licensed dentist or orthodontist who is physically present in the same building.

50. At the time the Board enacted Subparagraph (aa), Tanja D. Battle served as the Executive Director of the Board. The following individuals served as Board Members: Thomas P. Godfrey, Greggory G. Goggans, Richard Bennett, Rebecca B. Bynum, Tracy Gay, Steve Holcomb, Logan "Buzzy" Nalley, Jr., Antwan L. Treadway, H. Bert Yeargan, and Wendy Johnson.

51. According to their dental offices' websites, Gregory G. Goggans and Tracy Gay were offering patients clear aligner treatment products and services that compete with the products and services offered by SDC and its affiliated dental practices when they served on the Board and enacted Subparagraph (aa).

**C.    Selectively Targeting SDC, the Board Improperly Restricted Who Can Perform Digital Scans.**

52.    The Board approved amendments to Georgia Board of Dentistry Rule 150-9-.02 on or about January 24, 2018, which were scheduled to go into effect on May 22, 2018.

53.    A true and correct copy of the amendments to Georgia Board of Dentistry Rule 150-9-.02 is attached hereto as Exhibit A.

54.    The amendments purported to add ten additional duties to the list of duties an "expanded-duty dental assistant" may perform under Rule 150-9-.02(3). Prior to the amendments, Rule 150.9-.2(3) expressly included provisions related to "mak[ing] impressions."

55.    One of the additional duties added to the list appears as Subparagraph (aa) of Rule 150-9-.02(3) and states as follows: "(aa) Digital scans for fabrication (sic) orthodontic appliances and models" (hereinafter "Subparagraph (aa)").

56.    Prior to the enactment of Subparagraph (aa), upon information and belief, the Board did not purport to regulate digital scans or to bring enforcement actions against non-dentists and non-orthodontists who commonly performed such scans in Georgia.

57.    Prior to the adoption of Subparagraph (aa), SDC customers could, and did, visit a conveniently located SmileShop and request a digital scan from a

qualified technician without requiring the presence or direct supervision of a licensed dentist or orthodontist.  At no time prior to the adoption of Subparagraph (aa) did the Georgia Board of Dentistry advise SDC that its SmileShops were in violation of any law, regulation, or rule regarding the practice of dentistry or dental hygiene, including but not limited to the Dental Practice Act.

58.    Thus, although Subparagraph (aa) purports to expand the duties an "expanded duty dental assistant" may perform, it has the effect of restricting who may perform digital scans in Georgia because it allows only licensed dentists or orthodontists, or expanded duty dental assistants acting under the direct supervision of a licensed dentist or orthodontist who is physically present in the same building, to perform such scans.

59.    As a result of Subparagraph (aa), SDC will potentially be subject to the threat of: (1) Board action seeking to enjoin SDC from conducting business in Georgia, *see* O.C.G.A. § 43-11-2(e); and (2) enforcement action by the State seeking criminal penalties, *see* O.C.G.A. §§ 43-11-50, 43-11-76.

60.    Similarly, if the Act itself is applied to prohibit SDC technicians from performing digital scans, SDC will potentially be subject to the threat of: (1) Board action seeking to enjoin SDC from conducting business in Georgia, *see* O.C.G.A. §

43-11-2(e); and (2) enforcement action by the State seeking criminal penalties, *see* O.C.G.A. §§ 43-11-50, 43-11-76.

61.    Indeed, consistent with the Board's intention to prohibit SDC from offering digital scans in its SmileShops, the Board has threatened enforcement action against SDC if SDC offers digital scans by anyone other than a licensed dentist or orthodontist, or an expanded duty dental assistant acting under the "direct supervision" of a licensed dentist or orthodontist.

62.    Restricting the categories of individuals who can perform digital scans, either by the Act itself or by Subparagraph (aa) or some other means, is wholly unnecessary and not rationally related to a legitimate government interest because (1) the digital scanning process is simple, only involving use of a wand with a disposable sleeve and camera, (2) there is no trauma or health or safety risk to a customer, (3) the scan does not emit radiation, (4) the software in all digital scanners on the market prevents the technician from uploading an incomplete scan that has not captured all necessary intraoral structures, and (5) all photographs are later reviewed by a Georgia licensed dentist or orthodontist to ensure the quality of the photographs, a customer's candidacy for treatment, and a proper treatment plan.

63.    The Board's anti-competitive actions fail to acknowledge such realities. To the contrary, the Board has placed patients last by severely impairing

SDC's ability to deliver affordable products and services to affiliated licensed dentists and orthodontists, who in turn pass these savings along to their patients.

64.    Indeed, the Board's anti-competitive actions make it virtually impossible for SDC and its affiliated licensed dentists and orthodontists to lawfully conduct business in Georgia without making costly and prohibitive changes to SDC's current business model.

65.    On April 30, 2018, Georgia Governor Nathan Deal signed a "Certification of Active Supervision," pursuant to the Georgia Professional Regulation Reform Act, O.C.G.A. § 43-1C-1 *et seq*. The context and circumstances, however, demonstrate that the State of Georgia did not actively or adequately supervise the Board with regard to its anti-competitive actions against SDC, including passing Subparagraph (aa). Instead, the Board impeded the State of Georgia's ability to actively and adequately supervise the substance of the Board's actions by failing to fully advise the Governor of the reasons for its actions and the objections to its actions in passing Subparagraph (aa). For example, the Board's official minutes fail to provide a full and complete summary of objections to the Board's action expressed during official Board meetings, thereby depriving the State of Georgia of the information needed to actively and adequately supervise the Board's conduct. The Board also failed to explain to the State of Georgia the

impact Subparagraph (aa) will have on consumers in the "Relevant Market" and
failed to reveal the conflicts of interest of the Defendants who will benefit
monetarily, now or in the future, by restraining trade in the "Relevant Market."

66.    As set forth in greater detail below, the Board's anti-competitive
actions against SDC (1) reduce Georgia citizens' access to care, (2) increase the
cost of digital scans and overall orthodontic care, (3) do not protect the public, (4)
disproportionately regulate a safe procedure, (5) create an unnecessary barrier to
employment for Georgia citizens, (6) distinguish between technicians employed by
SDC and expanded-duty dental assistants who perform scans "directly supervised"
(within the meaning of Rule 150-9-.01(2)) by licensed dentists and orthodontists,
without a rational basis for such a distinction, and (7) deprive SDC of its
constitutionally protected liberty and property interests.

### C.    The Relevant Market.

67.    The "Relevant Market" in which to evaluate the anticompetitive effect
of the conduct of the Board and its members is the market for aligner treatment for
mild to moderate malocclusion in Georgia.

68.    The relevant products in this market are aligner treatments for mild
and moderate malocclusion.  The relevant products include clear aligners and
traditional braces that use brackets and wires, as well as potentially non-fixed

dental braces such as retainers, headgear, and palate expanders. Treatment options, of course, vary based on the particular needs of a patient, but these products are viable substitutes for consumers to consider in the treatment of mild-to-moderate malocclusion. The relevant market properly excludes aligner treatment of severe malocclusion because clear aligners are generally not an option for such treatment, and as such, consumers who need treatment for severe malocclusion do not regard clear aligners as a viable substitute. Treatment of severe malocclusion is substantially more expensive than treatment of mild-to-moderate malocclusion and may involve surgical services as well.

69.    The relevant geographic market is properly limited to Georgia. The Board purports to exercise authority over the provision of digital scan services for aligner treatment in Georgia. Furthermore, consumers in Georgia almost always seek aligner treatment from local providers in the State. Consumers who desire such services in Georgia do not travel out of state in any appreciable numbers to obtain aligner treatment. If the price of aligner treatment for mild-to-moderate malocclusion in Georgia increases as a result of actions of the Board, consumers in Georgia will not seek aligner treatment from providers in other states. Rather, such consumers will be forced to pay the higher prices for aligner treatment and travel

long distances within Georgia to seek such services only from licensed dentists in Georgia.

**D.    Selectively Restricting Who Can Perform Digital Scans Will Reduce Georgia Citizens' Access to Care.**

70.    Restricting the categories of individuals who can perform digital scans in Georgia will diminish Georgia citizens' access to care by reducing the number of locations where digital scans may be taken for fabrication of orthodontic appliances and models.

71.    At present, only 58 of 159 Georgia counties have a licensed orthodontist.

72.    Despite the massive volume of underserved patients in Georgia, the Board seeks to apply the Dental Practice Act to SDC in a way that would needlessly complicate an otherwise safe procedure that an unlicensed person can perform in a variety of locations.

73.    If the Act or Subparagraph(aa) is applied to prohibit SDC technicians from performing digital scans in SmileShops, SDC would no longer be able to provide one of the key elements of the services it currently offers to Georgia licensed dentists and orthodontists, which allows such dentists and orthodontists to provide affordable treatment to potential patients.  The dentist members of the Board, however, would be able to use their expanded-duty dental assistants to

continue to provide such scans to patients, even though such expanded-duty dental assistants often have less experience and specialized training in the use of the digital scanning equipment.  Moreover, no law or regulation would prohibit the dentist members of the Board who are not currently providing digital scans to potential patients from providing such scans in their offices in the future.

74.     Despite current plans to open additional SmileShops across the State of Georgia, many in areas where people cannot easily access orthodontic care and treatment, SDC would be forced to limit, if not entirely eliminate, its plans for increasing access to affordable orthodontic care across the State of Georgia if the Act or Subparagraph(aa) is applied to preclude SDC technicians from performing digital scans in SmileShops.

75.     As a result, rather than protect patients, the Board's anti-competitive actions against SDC will unnecessarily drive up costs and decrease access to care in the Relevant Market based on the mistaken belief that a digital scan must be performed by, or directly supervised by, a dentist.

76.     Taking a digital scan of a customer's teeth and gums is neither dangerous nor risky.  It is nothing more than the taking of photographs.  Nor does it require the knowledge, training, and education of a licensed dentist or orthodontist or an expanded-duty dental assistant to properly execute.

77.    Upon information and belief, a licensed dentist or orthodontist, or an expanded-duty dental assistant, does not have more training in or experience with intraoral digital scanning than SDC's technicians.  Indeed, upon information and belief, licensed dentists or orthodontists rarely, if ever, directly monitor an expanded-duty dental assistant while the scan is being performed.

78.    There is no legitimate medical purpose for prohibiting SDC's technicians from conducting digital scans while allowing dentists, orthodontists, or expanded-duty dental assistants to take such scans.   Indeed, even the Board Members who enacted Subparagraph(aa) recognized that the process of taking a digital scan is simple, safe, and requires little to no specialized training.

79.    Properly trained technicians such as those employed by SDC are capable of safely and accurately taking a digital scan of a customer's teeth and gums without the need for a dentist to be present.  The scan is not a dental procedure, but rather a non-invasive use of digital technology to create an accurate three-dimensional model of a customer's teeth, bite, gums, and palate.

80.    There is no known evidence that digital scans performed by a licensed dentist or orthodontist or done under the "direct supervision" of a licensed dentist or orthodontist are somehow safer or more accurate than scans taken without such "supervision."

### F.    Selectively Restricting Who Can Perform Digital Scans Will Increase Costs Paid By Consumers.

81.    Improperly restricting the categories of individuals who can perform digital scans, either by applying the Act itself or by applying Subparagraph (aa) to preclude SDC technicians from performing such scans in SDC SmileShops, will unnecessarily increase the cost of digital scans and overall aligner treatment for Georgia consumers by requiring highly paid personnel to perform or "directly supervise" an otherwise safe and simple procedure.  Many Georgia consumers also will incur increased costs by needing to travel to and pay for an office visit to a dentist or orthodontist, particularly when the office visit is not covered by insurance.  This increase in cost will be borne by consumers, who will pay more for such services than they otherwise would need to pay.

82.    Plaintiff SDC also will suffer significant economic injury and damage as a result of Defendants' exercise of their rule-making authority.  SDC will suffer lost business that it would have obtained by enabling SDC-affiliated dentists and orthodontists to offer lower priced and superior services to those offered by dentists and orthodontists who operate out of traditional brick-and-mortar dental offices.

83.    Indeed, the only parties who benefit from the Board's actions are the licensed dentists and orthodontists who offer, or will offer, digital scanning

services in their offices, because they will be able to demand additional compensation for requiring a photo session to take place in their office. Such requirements needlessly and unreasonably drive up costs and entirely eliminate the ability of some citizens to receive convenient, affordable care; indeed, care that has been proven to positively impact many other aspects of a person's overall health.

### G. Selectively Restricting Who Can Perform Digital Scans Does Not Protect The Public.

84.    Restricting the categories of individuals who can provide digital scans to exclude SDC technicians operating in SmileShops does not provide any additional protection to the public.

85.    The taking of a digital scan is extremely safe, and the process consists of using a wand with a camera at varying angles to approximate the teeth and tissue so as to get a more accurate and predictable model of the teeth and gums.

86.    The technology of taking digital scans is extremely user-friendly, providing real time feedback to the user regarding the accuracy of the scan and informing the user of where additional scans are needed to complete the full scan.

87.    This advanced process does not use any radiation and allows a technician to photograph a customer's teeth and gums without the customer experiencing any trauma, pain, or morbidity.

88.     The digital scanners are also easy to clean between customers and thus present no meaningful risk of cross-contamination as long as the technicians remove and discard the disposable cover and wipe the wand with a disinfecting wipe after each use.  SDC technicians are carefully trained on these procedures and are required to follow them after each scan.

89.     Given that digital scans present virtually no risk to consumers, requiring a licensed dentist or orthodontist, or an expanded-duty dental assistant operating under the "direct supervision" of a licensed dentist or orthodontist, unnecessarily complicates a safe procedure by needlessly imposing regulatory burdens that do not provide any additional protection to the public.

90.     Indeed, as noted above, SDC has performed hundreds of thousands of customer scans in existing SmileShops nationwide—and thousands of customer scans in Georgia alone—without receiving a single complaint of physical injury, infection, or other adverse outcome associated with the performance of the scan.

91.     By contrast, dental impressions using putty can pose several risks to patients.  For example, the putty can become contaminated during the mixing process, posing risk of harm to a patient.  Putty also can become dislodged during use, thereby creating a choking hazard for a patient.  Putty also might pull a loose tooth during the process of creating the impression, creating an immediate need for

treatment.  Traditional dental impressions using putty pose other potential health risks.  Because of these health risks for dental impressions using putty, such dental impressions require careful supervision by trained medical professionals.

**H.    Selectively Restricting the Categories of Individuals Who Can Perform Digital Scans Will Disproportionately Regulate A Safe Procedure.**

92.    Prohibiting individuals other than licensed dentists or orthodontists, or expanded-duty dental assistants operating under the "direct supervision" of a licensed dentist or orthodontist, from performing digital scans disproportionately regulates an extremely safe procedure by requiring education and certification requirements that are more stringent than the Board's requirements for more invasive and dangerous procedures.

93.    Such restrictions impose greater burdens on digital scanning than a number of other more complex and more dangerous medical or dental procedures, all of which are more invasive and dangerous and require more medical/dental training and experience than does a digital scan, including:

- capturing a radiographic image using ionizing radiation (x-ray);

- removing sutures;

- applying topical anesthetic;

- cementing temporary crowns and bridges with intermediate cement;

- placing intracoronal temporary restorations using intermediate cement;

- polishing the enamel and restorations of the anatomical crown;

- removing dry socket medication;

- cutting and tucking ligatures; and

- performing phlebotomy and venipuncture procedures.

94.     Prior to SDC's entry in the Relevant Market, virtually all of the procedures that a dentist or orthodontist could delegate to an assistant only if the assistant was acting under the dentist or orthodontist's "direct supervision" involved either (1) invasive procedures or (2) the administration of sedation compounds, such as nitrous oxide. Unlike these procedures, however, digital scans pose no risk to customer safety. Thus, prohibiting individuals other than licensed dentists or orthodontists, or expanded-duty dental assistants acting under the "direct supervision" of a licensed dentist or orthodontist, from performing digital scans is inconsistent with how the Board has construed its powers under the Act with respect to other services and procedures and evidences a clear intent to harm SDC, not to protect patients.

95.     In sum, there is no rational basis to restrict the categories of individuals who can perform digital scans to licensed dentists or orthodontists and expanded-duty dental assistants acting under the "direct supervision" of a licensed

dentist or orthodontist.  Rules that allow trained technicians to perform such scans on their own, without a licensed dentist or orthodontist physically present in the same building, are sufficient to protect patients while simultaneously promoting increased access to care and lower cost to consumers in the Relevant Market.

I.  **Selectively Restricting the Categories of Individuals Who Can Perform Digital Scans Will Create An Unnecessary Barrier To Employment For Georgia Citizens.**

96.    Precluding anyone other than a licensed dentist or orthodontist, or an "expanded-duty dental assistant" acting under the "direct supervision" of a licensed dentist or orthodontist, from performing digital scans will create an unnecessary barrier to employment for Georgia citizens by adopting strict education and certification requirements that are wholly unnecessary for and unrelated to the task at hand.  Moreover, because of increased regulatory barriers, SDC, and others like it, would no longer be able to open shops at which digital scans are conducted throughout the State of Georgia, reducing the number of opportunities for qualified technicians and harming competition in the Relevant Market.

## CAUSES OF ACTION
## COUNT ONE: VIOLATION OF <u>15 U.S.C. § 1</u>

### (Brought Against All Defendants)

97.    SDC re-alleges and incorporates paragraphs 1 through 96 as if fully set forth herein.

98.    The members of the Board, by and through their anticompetitive actions as outlined herein, entered into a contract, combination, or conspiracy in restraint of trade and commerce to prevent or impede competition from SDC in violation of Section 1 of the Sherman Act, <u>15 U.S.C. § 1</u>.

99.    Among other things, in furtherance of their contract, combination or conspiracy in restraint of trade, the members of the Board have agreed and acted upon a policy of excluding certain non-dentists from providing digital scans without the "direct supervision" of dentists, thereby harming competition in the Relevant Market.  The Board Members agreed to selectively enforce purported restrictions on non-dentists providing digital scans without the "direct supervision" of dentists in an effort to restrain competition from SDC.  This agreement among the Board Members is manifested, among other ways, in the fact that the Board Members took no action to regulate digital scanning or to preclude non-dentists or orthodontists from performing digital scans prior to SDC's entry in the Relevant Market; in the Board Members' enactment of Subparagraph (aa), which had the

effect and intent of narrowing the categories of individuals who could perform digital scans in Georgia, and of specifically precluding SDC technicians from performing digital scans in SmileShops; and in the Board Members' threats to bring an enforcement action against SDC if SDC technicians continue to perform digital scans in SmileShops without the physical presence of a licensed dentist or orthodontist.

100.   As is evidenced by their targeting of SDC, their imposition of more stringent requirements on who can perform digital scans than those that existed before SDC entered the Relevant Market, and their threats to bring an enforcement action against SDC, the Board Members demonstrated a unity of purpose, as well as common design and understanding, to reduce or eliminate competition in the Relevant Market.

101.   As is demonstrated by the Board Members' actions described above, the Board Members possessed, and still possess, a conscious commitment to a common scheme designed to achieve an unlawful objective.

102.   The Board Members' actions constitute a continuing agreement, understanding, and concert of action among market participants that are practicing dentists in the State of Georgia.

103.   The Board Members' actions have the purpose and effect of unreasonably restraining trade in the Relevant Market, the net effects of which are anticompetitive, and any purported procompetitive justifications are illegitimate and pretextual.  The Board Members' actions have the following anticompetitive effects in the Relevant Market:

a.   preventing and deterring the use of certain non-dentists for digital scan services needed to provide clear aligner treatment in Georgia;

b.   depriving consumers of the benefits of competition on price and quality for aligner treatment in Georgia by causing new, efficient entrants, like SDC, to shut down or incur higher costs;

c.   reducing consumer choice and the availability of aligner treatment to consumers in Georgia;

d.   reducing incentives for innovation in the provision of aligner treatment in Georgia; and

e.   increasing the prices that customers in Georgia pay for aligner treatment.

104.   The Board Members' actions constitute a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

105.   Alternatively, the Board Members' actions constitute a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason.  On their face, the Board Members' actions restrict, and are intended to restrict, the method of competing in the Relevant Market, thereby restricting the number of competitors and causing prices in the Relevant Market to rise, maintain, or stabilize above competitive levels.  The Board Members have market power in the Relevant Market and can enforce their output-restricting agreement by using the legal process of the State of Georgia to preclude entrance into the Relevant Market or to restrict the method of competition in the Relevant Market.  The Board Members can, and do, use investigators of the State of Georgia to locate persons who offer digital scan services in contravention of their agreement that only licensed dentists (or those they "directly supervise") offer the services and threaten to use the office of the Georgia Attorney General to enforce sanctions against any individual or business that operates in contravention of their agreement, which results in harm to competition in the Relevant Market.  The Individual Dentist Board Members are actual or potential participants in the Relevant Market and have incentives to restrict competition in the Relevant Market, and no legitimate business justification exists for the Board Members' agreement.

106.   The Board Members' actions evidence predatory intent to deprive dentists that utilize a new, more efficient method of competition of a fair opportunity to compete in the Relevant Market.  Through their actions, the Board Members intend to reduce the number of providers of aligner treatment in Georgia and the output of such services.  The Board Members' actions do not enhance public health and safety in Georgia and do not serve any legitimate public purpose.

107.   As a direct, proximate, and foreseeable result of the Board Members' actions, Plaintiff has or will suffer damages and injury.

## COUNT TWO: VIOLATION OF EQUAL PROTECTION CLAUSE, U.S. CONST., FOURTEENTH AMENDMENT

### (Brought Against All Defendants)

108.   SDC re-alleges and incorporates paragraphs 1 through 96 as if fully set forth herein.

109.   This Count is brought pursuant to the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

110.   Before SDC began offering digital scans in Georgia, upon information and belief, digital scans were typically performed by assistants, technicians, or hygienists—not by licensed dentists or orthodontists.

111.   When SDC entered the relevant market, the Board Members, acting under the color of State law, adopted a rule (Subparagraph (aa)) intended to

prohibit SDC from effectively competing in the relevant market. Although the rule purported to expand the duties of "expanded-duty dental assistants," the rule in fact restricted the class of individuals who could perform digital scans by prohibiting such scans unless a licensed dentist or orthodontist was physically present in the same building at the time the scan was performed—a requirement that, upon information and belief, was never understood to apply and was never enforced prior to enactment of the rule.

112.    Subparagraph (aa) creates a distinction between persons and entities who offer digital scans by technicians (such as SDC), and persons and entities who offer digital scans by licensed dentists or orthodontists or by expanded-duty dental assistants, acting under the "direct supervision" of a licensed dentist or orthodontist.

113.    In addition, to the extent the Act itself prohibits anyone other than a licensed dentist or orthodontist from performing digital scans—or others the Board subsequently deems capable of performing digital scans under the "direct supervision" of a licensed dentist or orthodontist—the Act itself, as applied to SDC, creates a distinction between persons and entities who offer digital scans by technicians (such as SDC), and persons and entities who offer digital scans by licensed dentists or orthodontists.

114.   The Equal Protection Clause of the Fourteenth Amendment does not allow government to treat similarly situated persons differently unless the reason for doing so bears a rational relationship to a legitimate governmental interest.

115.   As detailed above, there is no rational basis for Georgia's distinction between persons and entities who offer digital scans by technicians and persons and entities who offer the identical service by licensed dentists or orthodontists or by expanded duty dental assistants, acting under the direct supervision of a licensed dentist or orthodontist.  Accordingly, SDC has been denied equal protection of the law.

116.   Unless Defendants are enjoined from committing the above-described violations of the Equal Protection Clause of the Fourteenth Amendment, SDC will suffer great and irreparable harm.  As detailed above, in the absence of an injunction, SDC will be prohibited from employing technicians to perform digital scans and will face the possibility of enforcement action and possible criminal penalties if it continues to do so.

117.   This denial of equal protection of the law will harm not only SDC's business, it will also deprive consumers of the benefits of competition, increase costs, reduce choice, and reduce incentives for innovation in the provision of aligner treatment in Georgia.

118.   Accordingly, this Court should grant declaratory and injunctive relief restraining Defendants' denial to SDC of equal protection of the law and award SDC attorneys' fees and costs.

## COUNT THREE: VIOLATION OF EQUAL PROTECTION CLAUSE, GA. CONST., ART. I, SEC. I, ¶ II

### (Brought Against All Defendants)

119.   SDC re-alleges and incorporates paragraphs 1 through 96 as if fully set forth herein.

120.   The Equal Protection Clause in the Georgia Constitution, art. I, Sec. I, Paragraph II, provides that "[p]rotection to person and property is the paramount duty of government and shall be impartial and complete. No person shall be denied the equal protection of the laws."

121.   The Equal Protection Clause of the Georgia Constitution guarantees the right of similarly situated individuals to be treated similarly.

122.   It is "well established law by decisions of [the Georgia Supreme Court] that this clause of the Constitution allows classification by legislation when and only when the basis of such classification bears a direct and real relation to the object or purpose of the legislation." *Simpson v. State*, 218 Ga. 337, 338 (1962).

123.   Subparagraph (aa) creates a distinction between persons and entities who offer digital scans by technicians (such as SDC), and persons and entities who

offer digital scans by licensed dentists or orthodontists or by expanded-duty dental assistants, acting under the "direct supervision" of a licensed dentist or orthodontist.

124.   In addition, to the extent the Act itself prohibits anyone other than a licensed dentist or orthodontist from performing digital scans—or others the Board subsequently deems capable of performing digital scans under the "direct supervision" of a licensed dentist or orthodontist—the Act itself, as applied to SDC, creates a distinction between persons and entities who offer digital scans by technicians (such as SDC), and persons and entities who offer digital scans by licensed dentists or orthodontists.

125.   It is irrational to classify trained technicians, such as those employed by SDC, who perform digital scans in SDC SmileShops, differently than licensed dentists or orthodontists or expanded-duty dental assistants who perform the same digital scans in brick-and-mortar dental offices. Doing so lacks a direct and real relationship to the purposes of the Act and/or Subparagraph(aa). Indeed, there is no reason to think that the quality of a digital scan performed by a trained SDC technician or the risk (if any) that such scan may pose to a customer is any different than the same digital scan performed by a licensed dentist or orthodontist or by an expanded-duty dental assistant acting under the "direct supervision" of a

licensed dentist or orthodontist. Accordingly, SDC has been denied equal protection of the law in violation of the Equal Protection Clause of the Georgia Constitution.

126.   Unless Defendants are enjoined from committing the above-described violations of the Equal Protection Clause of the Georgia Constitution, SDC will suffer great and irreparable harm.  As detailed above, in the absence of an injunction, SDC will be prohibited from employing technicians to perform digital scans and will face the possibility of enforcement action and possible criminal penalties if it continues to do so.

127.   SDC has no legal or administrative remedy available to prevent or minimize the harm to its constitutional rights caused by the Act and/or Subparagraph (aa) other than the injunction sought herein.

128.   This denial of equal protection of the law will harm not only SDC's business, but will also deprive consumers of the benefits of competition, increase costs, reduce choice, and reduce incentives for innovation in the provision of aligner treatment in Georgia.

129.   Accordingly, this Court should grant declaratory and injunctive relief restraining Defendants' denial to SDC of equal protection of the law and award SDC attorneys' fees and costs.

## COUNT FOUR: VIOLATION OF DUE PROCESS, U.S. CONST. FOURTEENTH AMENDMENT

### (Brought Against All Defendants)

130.    SDC re-alleges and incorporates paragraphs 1 through 96 as if fully set forth herein.

131.    This Count is brought pursuant to the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

132.    SDC possesses liberty and property interests in the ability to conduct a business that provides non-clinical administrative support services to contractually affiliated dental practices, including the ability to offer digital scans for fabrication of orthodontic appliances and models, subject only to regulations that are rationally related to a legitimate government interest.

133.    Subparagraph (aa), as applied to SDC, deprives SDC of its liberty and property interests that are protected by the Due Process Clause by imposing restrictions on its ability to offer digital scans for fabrication of orthodontic appliances and models that are not rationally related to any legitimate governmental interest.  Indeed, as described above, SDC would be forced to limit, if not entirely eliminate, its plans for increasing access to affordable orthodontic care across the State of Georgia if Defendants are allowed to enforce Subparagraph (aa) against SDC.

134.   In addition, to the extent the Act itself prohibits anyone other than a licensed dentist or orthodontist from performing digital scans—or others the Board subsequently deems capable of performing digital scans under the "direct supervision" of a licensed dentist or orthodontist—the Act itself, as applied to SDC, deprives SDC of its liberty and property interests that are protected by the Due Process Clause of the Fourteenth Amendment by imposing restrictions on its ability to offer digital scans for fabrication of orthodontic appliances and models that are not rationally related to any legitimate government interest. Indeed, as described above, SDC would be forced to limit, if not entirely eliminate, its plans for increasing access to affordable orthodontic care across the State of Georgia if Defendants are allowed to enforce the Act against SDC to prohibit SDC from offering digital scans as described above.

135.   As detailed above, the application of the Act and/or Subparagraph(aa) to SDC is not rationally related to any legitimate government interest.

136.   Unless Defendants are enjoined from committing the above-described violations of the Fourteenth Amendment, SDC will suffer great and irreparable harm.  As detailed above, in the absence of an injunction, SDC will be prohibited from employing technicians to perform digital scans and will face the possibility of enforcement action and possible criminal penalties if it continues to do so.

137.   Accordingly, this Court should grant declaratory and injunctive relief restraining Defendants' denial to SDC of Due Process as guaranteed by the Fourteenth Amendment and award SDC attorneys' fees and costs.

## COUNT FIVE: VIOLATION OF DUE PROCESS CLAUSE, GA. CONST., ART. I, SEC. I, ¶ I

### (Brought Against All Defendants)

138.   SDC re-alleges and incorporates paragraphs 1 through 96 as if fully set forth herein.

139.   The Due Process guarantee in the Georgia Constitution, art. I, Sec. I, Paragraph I provides that "[n]o person shall be deprived of life, liberty, or property except by due process of law."

140.   This Due Process guarantee of the Georgia Constitution protects, among other things, the right to pursue a chosen business free from arbitrary, irrational, unreasonable, or oppressive government interference.

141.   To comport with the guarantees of the Due Process Clause of the Georgia Constitution, a law or regulation must "not be unreasonable, arbitrary or capricious, and [ ] the means adopted must have some real and substantial relation to the object to be attained." *Rockdale Cty. v. Mitchell's Used Auto Parts*, 243 Ga. 465, 465, 254 S.E.2d 846, 847 (1979).

142.    Subparagraph (aa), as applied to SDC, deprives SDC of its liberty and property interests that are protected by the Due Process Clause of the Georgia Constitution by imposing restrictions on its ability to offer digital scans for fabrication of orthodontic appliances and models that are unreasonable, arbitrary, and capricious and that are not rationally related to any legitimate governmental interest.  Indeed, as described above, SDC would be forced to limit, if not entirely eliminate, its plans for increasing access to affordable orthodontic care across the State of Georgia if Defendants are allowed to enforce Subparagraph (aa) against SDC.

143.    In addition, to the extent the Act itself prohibits anyone other than a licensed dentist or orthodontist from performing digital scans—or others the Board subsequently deems capable of performing digital scans under the "direct supervision" of a licensed dentist or orthodontist—the Act itself, as applied to SDC, is unreasonable, arbitrary, and capricious and deprives SDC of its liberty and property interests that are protected by the Due Process Clause of the Georgia Constitution by imposing restrictions on its ability to offer digital scans for fabrication of orthodontic appliances and models that are not rationally related to any legitimate government interest. Indeed, as described above, SDC would be forced to limit, if not entirely eliminate, its plans for increasing access to affordable

orthodontic care across the State of Georgia if Defendants are allowed to enforce the Act against SDC to prohibit SDC from offering digital scans as described above.

144.   Unless Defendants are enjoined from committing the above-described violations of the Due Process guarantee of the Georgia Constitution, SDC will suffer great and irreparable harm.  As detailed above, in the absence of an injunction, SDC will be prohibited from employing technicians to perform digital scans and will face the possibility of enforcement action and possible criminal penalties if it continues to do so.

145.   Accordingly, this Court should grant declaratory and injunctive relief restraining Defendants' denial to SDC of Due Process as guaranteed by the Georgia Constitution and award SDC attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SDC respectfully requests relief as follows:

(a)    Declare that the Dental Practice Act and Rule 150-9-.02(3)(aa), as applied to SDC to restrict digital scanning performed by certain non-dentists, violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution;

47

(b)     Declare that the Dental Practice Act and Rule 150-9-.02(3)(aa), as applied to SDC to restrict digital scanning performed by certain non-dentists, violate the Equal Protection and Due Process Clauses of the Georgia Constitution;

(c)     Preliminarily and permanently enjoin the selective enforcement of the Act and Rule 150-9-.02(3)(aa) against Plaintiff as it relates to digital scanning performed by certain non-dentists;

(d)     Preliminarily and permanently enjoin Defendants from taking any other action in furtherance of their unlawful conspiracy to restrain competition from SDC in the Relevant Market;

(d)     Award reasonable attorneys' fees, costs, and expenses in this action pursuant to 15 U.S.C. § 15 and 42 U.S.C. § 1988; and

(e)     Award such further relief as the Court deems just and proper.

## JURY DEMAND

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a jury trial of any and all issues in this action so triable of right.

Respectfully submitted this 29th day of July, 2022.

*/s/ Jeffrey S. Cashdan*
Jeffrey S. Cashdan (Ga. Bar No. 115775)
jcashdan@kslaw.com
Madison H. Kitchens (Ga. Bar No. 561653)

48

mkitchens@kslaw.com
Adam Reinke (Ga. Bar No. 510426)
areinke@kslaw.com
Franklin Sacha (Ga. Bar No. 484155)
fsacha@kslaw.com

KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309
Phone:  (404) 572-4600
Fax:  (404) 572-5100

*Attorneys for Plaintiff*
*SmileDirectClub, LLC*

# EXHIBIT A

**SYNOPSIS OF PROPOSED AMENDMENTS OF THE
GEORGIA STATE BOARD OF DENTISTRY
150-9-.02 Expanded Duties of Dental Assistants.**

Purpose of amendment: The purpose of this amendment is to expand the list of expanded duties a dental assistant is allowed to perform.

Main Features: The main feature of this amendment is to add ten (10) additional duties.

**DIFFERENCES OF PROPOSED AMENDMENTS OF THE
GEORGIA STATE BOARD OF DENTISTRY
150-9-.02 Expanded Duties of Dental Assistants.**

Note: Struck through text is proposed to be deleted. Underlined text is proposed to be added.

**150-9-.02        Expanded Duties of Dental Assistants.**

(1) To meet the requirements of an expanded duty dental assistant, a dental assistant must have a high school diploma, or the equivalent thereof, proof of current CPR certification and a certificate documenting that he or she has successfully completed the course pertaining to the specific duties outlined in that certificate. Only those expanded duties, which are listed on the certificate(s), may be performed by an expanded duty dental assistant. An expanded duty dental assistant certificate may be issued by an accredited dental assisting program, a dental hygiene school, a dental school or a professional association recognized and approved by the Georgia Board of Dentistry to a candidate who has successfully completed the required certificate courses (each of which must be a minimum of four hours) from an accredited dental assisting program, a dental hygiene school, a dental school or professional association recognized and approved by the Georgia Board of Dentistry and met all other requirements of an expanded duty assistant; and completed an examination demonstrating competency in specific duties that is administered by a licensed dentist on behalf of the accredited dental assistant program, dental hygiene school, dental school or professional association recognized and approved by the Georgia Board of Dentistry.

(2) Eligibility for taking said courses requires that the candidate meet at least one of the following criteria:

(a) Possess current certification that the candidate is a Certified Dental Assistant.

(b) Be a graduate of a one (1) year accredited dental assisting program or a dental assisting program approved by the Board or be eligible for graduation.

(c) Have been employed as a chair side assistant by a licensed dentist for a continuous six (6) month period within the previous three (3) years. (Note: An expanded duties certificate would be issued to a candidate only upon proper proof of graduation.)

(3) The employer of the expanded duty assistant shall have readily available in the dental office a copy of the certificate(s) issued from the sponsor of the accredited course(s) of study to the expanded duty dental assistant. The expanded duties specific to the course(s) taken and in which [a] certificate(s) [has/have] been issued may be delegated to dental assistants, who are performing their duties under the direct supervision of a licensed dentist. The following expanded duties may be delegated to those assistants meeting the educational requirements established by Board Rule 150-9-.02(1) and possessing a certificate(s) of the course(s) taken delineating the duties specific to that course-:

(a) Apply desensitizing agents to root surfaces of teeth and prepared dentinal surfaces of teeth prior to cementation of temporary restorations and crowns, bridges, or inlays.

(b) Place cavity liner, base or varnish over unexposed pulp.

(c) Intraoral fabrication of temporary crowns and bridges. All such adjustments must be performed extraorally.

(d) Perform face bow transfer.

(e) Make impressions to be used to repair a damaged prosthesis.

(f) Place periodontal dressing.

(g) Redressing (not initial placement of dressing) and removing dressing from alveolar sockets in post-operative osteitis when the patient is uncomfortable due to the loss of dressing from the alveolar socket in a diagnosed case of post-operative osteitis.

(h) Make impressions to be used to fabricate a night guard (bruxism or muscle relaxation appliance). All adjustments must be performed extraorally. Final adjustment must be made by the dentist.

(i) Monitor the administration of nitrous oxide/oxygen; turn off nitrous oxide/oxygen at the completion of the dental procedure and make adjustments to the level of nitrous oxide/oxygen, but only following the specific instructions of the dentist.

(j) Apply topical anticariogenic agents.

(k) Apply pit and fissure sealants, and primer and bonding agents to etched enamel or dentin; and light-cure with a fiber-optic light source (not to include the use of a laser device).

(l) Packing and removing retraction cord, as prescribed by the dentist, so long as said cord is used solely for restorative dental procedures.

(m) Changing of bleaching agent, following initial applications by the dentist, during the bleaching process of vital and non-vital teeth after the placement of a rubber dam; and applying the fiber-optic light source of a curing light for activation of the bleach (not to include the use of a laser device).

(n) Rebond brackets after a licensed dentist has examined the affected tooth and surrounding gingiva and found no evidence of pathology.

(o) Remove bonded brackets with hand instruments only.

(p) Make impressions for passive orthodontic appliances.

(q) Apply primer and bonding agents to etched enamel or dentin; and light cure with fiber-optic light source (not to include use of a laser device).

(r) Take and record vital signs.

(s) Size and fit stainless steel crowns on a primary tooth only.

(t) Place springs on wires.

(u) Place hooks on brackets.

(v) Remove loose or broken bonds.

(w) Remove ligature and arch wires.

(x)  Band, select, and pre-size arch wires and place arch wires after final adjustment and approval by the dentist.

(y) Select, pre-fit, cement, cure, and remove ortho bands or brackets.

(z) Place and remove pre-treatment separators.

(aa) ~~Scan d~~Digital scans for fabrication orthodontic appliances and models.

Authority: O.C.G.A. §§43-11-7 to 43-11-9, 43-11-80, and 43-11-81.